IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAMIAH MURPHY<br>842 Finch Drive<br>Bensalem, PA 19020<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE CENTER FOR<br>NEURODEVELOPMENTAL<br>HEALTH, LLC D/B/A NEURABILITIES<br>HEALTHCARE<br>2050 Voorhees Town Center<br>Voorhees, NJ 08043<br>　　　and<br>CNNH MANAGEMENT INC.<br>2050 Voorhees Town Center<br>Voorhees, NJ 08043<br>　　　and<br>COUNCIL CAPITAL III, L.P.<br>30 Burton Hills Blvd. Suite 576<br>Nashville, TN 37215<br><br>　　　　　Defendants. | CIVIL ACTION<br><br>No. _____<br><br><br><br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Plaintiff, Kamiah Murphy, (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

### I. **Introduction**

1. Plaintiff has initiated this action against the Center for Neurological Neurodevelopment d/b/a NeurAbilities Healthcare, CNNH Management Inc. and Council Capital III, L.P., (hereinafter referred to collectively as "Defendants") for violations of the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601, *et. seq*.), the New Jersey Family Leave Act, the Americans with Disabilities Act, as amended ("ADA" – 42 U.S.C. §§ 12101 *et.*

*seq.*), and the New Jersey Law against Discrimination ("NJ LAD" - N.J.S.A. §§ 10:5-1 *et. seq.*), and 42 U.S.C. § 1981. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## II.   Jurisdiction and Venue

2.   This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this State and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

3.   The United States District Court for the District of New Jersey has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under laws of the United States (including the FMLA, ADA and Section 1981 claims).  This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as her federal claims asserted herein.

4.   Venue is properly laid in this District pursuant to 28 U.S.C. sections 1391(b)(1) and (b)(2), because Defendants reside in and/or conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## III.   Parties

5.   The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.   Plaintiff is an adult with an address as set forth above.

7. Defendant the Center for Neurological and Neurodevelopmental Health, LLC, d/b/a NeurAbilities Healthcare (referred to throughout the Complaint as "NeurAbilities") is a company headquartered in Voorhees, New Jersey -- providing neurological, behavioral and neurodevelopmental services in New Jersey and Pennsylvania (operating 17 different locations throughout NJ and PA, and incorporated in NJ).

8. Defendant CNNH Management Inc., (the Center for Neurological and Neurodevelopmental Health)(or "CNNH") is incorporated in the State of Delaware, but operates its principal place of business out of the same physical location as Defendant NeurAbilities with the same shared management and operations.

9. Defendant Council Capital III, L.P. (referred to individually in the Complaint as "Council Capital") is a Nashville-based healthcare private equity firm, with a registered partnership in the state of Tennessee. NeurAbilities is considered one of Defendant Council Capital's "portfolio companies," which means Council Capital diverts resources toward ensuring the growth of NeurAbilities' business operations, and exerted significant control over its operations and employees (such as Plaintiff).

10. Plaintiff was paid through Defendant NeurAbilities, but received a handbook through Defendant CNNH, and Plaintiff directly reported to numerous of Defendants' high level managers who equally directed and controlled Plaintiff's work assignments and time off.

11. Defendants are sufficiently interrelated in their operations, management, advertising, resources, and supervision of employees such that they are properly considered joint, single and/or integrated employers of Plaintiff for the purposes of this lawsuit.

12. At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the benefit of Defendants.

### IV.   Factual Background

13. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

14. Before coming to work for Defendants, Plaintiff had significant experience within the Human Resources field, and supported large health care organizations with several thousand employees.

15. Plaintiff was hired on or about December 19, 2022; in total, Plaintiff was employed by Defendants for approximately 2.5 years until her abrupt termination in March of 2025, discussed *infra*.

16. Although Plaintiff was permitted the ability to work as a remote employee, Plaintiff was considered a New Jersey based employee for Defendants, and had a physical office space at Defendants' Voorhees, NJ location where she traveled for work as needed.

17. At all times, Plaintiff was employed by Defendants as "Vice President, People Operations" (a/k/a) the Vice President of Human Resources.

18. As VP, People Operations, Plaintiff's job description identified that she directly reported to Defendants' Chief Operating Officer ("COO"), but she also typically reported to various different c-suite executives of all Defendants during her tenure.

19. When Plaintiff was hired, Defendant NeurAbilities' CEO was one Kathleen Stengel and Plaintiff reported to Stengel depending upon the project/work assignment at hand.

20. Stengel remained the CEO through in or about the Spring of 2024 (after which time, there was a void for several months), until a new CEO was hired in or about August of 2024 (discussed *infra*).

21. Upon hire, Plaintiff directly reported to Defendant NeurAbilities' Chief Operating Officer: Geoff Crisanti.

22. At all relevant times, Chris Nichols' was held out as Portfolio "Chief Talent Officer" for Defendant Council Capital; Nichols directed Plaintiff's work beginning in or about early 2024 until the new CEO was hired in or about August of 2024 (evincing the joint employer relationship between these entities).

23. In or about August of 2024, Andrew Holstein became Defendant NeurAbilities' new CEO, and also Plaintiff's direct manager (for the last approximate 6-7 months of Plaintiff's employment).

24. Plaintiff suffers from certain mental health disabilities, including as mere examples: anxiety, ADHD, depression, PTSD and other related health complications.

25. At all relevant times, these disabilities substantially impacted Plaintiff's ability to concentrate and focus at times, as well as work at times (not intended to be an exhaustive list).

26. In light of Plaintiff's aforementioned disabilities, Plaintiff requested very modest medical accommodations, including (a) a particular software application to be of assistance in performing her job in light of her conditions; (b) periodic absences (albeit infrequent); and (c) a short medical leave in November of 2024 (discussed *infra*).

27. One primary accommodation Plaintiff sought was permission to use (and obtain) a software program known as "Monday.com." Monday.com is a cloud-based platform that is extremely versatile for managing projects, tasks, processes and offering features like workload

management for teams, project management, CRM functionalities, and automation capabilities (with a customizable visual interface).

28. Shortly after her hire, Plaintiff pursued workplace accommodations about a program called Monday.com as a result her diagnosis of ADHD.

29. Plaintiff originally spoke with Crisanti, one (1) Dan Clemons (CFO), and one Jon Martin (Vice President, Operations Support).

30. Martin emailed the then CEO and other management on January 19, 2023 relaying: "I believe the workload management benefits of monday.com will significantly benefit our continued process improvement goals around People Operations" . . . and further explaining he was "confident an investment in monday.com would be implemented in an effective and timely manner."

31. Martin suggested, however, verifying certain minor matters before full integration in his January 19, 2023 email correspondence, and Plaintiff immediately verified the matters, which included confirming HIPPA compliance and certain costs (which Plaintiff confirmed via email as well).

32. However, to Plaintiff's complete shock, this exceedingly basic accommodation was **never** ultimately granted (and this was despite verbal and email confirmations identifying the reasonableness of her request).

33. When Plaintiff was brought in to oversee Defendants' Human Resources Department, it was readily apparent that Defendants' management lacked any direction from an HR standpoint, and that included guidance on *what* the ADA and other employment laws required, and modifying and *implementing* those policies.

34. Plaintiff received significant pushback from Defendants' executive leadership on adhering to state and federal laws when it came to pay practices, leave entitlements and other Human Resources issues.

35. Plaintiff quickly began an overhaul of all of Defendants' internal policies, including their ADA policy, and guidance on how to (properly) treat employees invoking FMLA protections (discussed further *infra*).

36. There was a real hostility towards Plaintiff at times strictly because of her health during her period of employment. By way of one example, on October 4, 2023, Plaintiff emailed Martin expressing that she was compelled to adjust her level of interaction with him after he was abusive towards her for mentioning her ADHD as a reason for various work calendar needs and calendar organization.

37. By way of a second example, in mid-2024, even though Plaintiff had worked long hours, weekends, and nearly all the time - - she felt pressured not to miss certain days from work (even if for health).

38. As a result and by the spring of 2024, Plaintiff had to discuss with Nichols having major depressive disorder, an anxiety disorder, and ADHD (justifying some limited time off from work) and her need at times to provide care for her daughter with (serious health problems).

39. Nicholas initially ignored Plaintiff outright until she followed up with him (and because of his refusal to initially engage, Plaintiff attempted to assure him she would move things around to accommodate the business even though her health and her daughter's health required some intermittent time off).

40. When CEO Holstein was hired in or about August of 2024, Plaintiff was very candid with him about both her own health issues and those of her teenage daughter.

41. Plaintiff's daughter has been diagnosed with very serious mental health problems, including major depressive disorder, generalized anxiety disorder, PTSD, ADHD and autism.

42. Defendants' entire executive leadership team had become aware of Plaintiff's needs to care for her daughter (and it was well known that Plaintiff's daughter was treating with Defendants' own Chief Medical Officer for these serious mental health issues).

43. If an urgency arose with Plaintiff's daughter because of an emotional breakdown (threats of suicide, depressive episodes, or panic episodes as mere examples), Plaintiff would ask to modify her schedule to take time off to tend to her daughter.

44. Defendants' executive management overtly discouraged the taking of FMLA leave, and made comments directly to Plaintiff about a Human Resources employee taking FMLA, including: "if she wants a seat at the table," "she needs to be more reliable," and "when she's not here, what are we supposed to do," to which Plaintiff openly explained that employees have legal rights to FMLA and that they are obligated to make it work.[1]

45. Shortly after CEO Holstein's hire by Respondent in August of 2024, Plaintiff requested from Holstein permission to obtain, implement, and purchase Monday.com.

46. By way of one example, in a September 3, 2024 email with Holstein, Plaintiff made it clear it was a medical "accommodation" request for her disabilities. Holstein had even been copied on a similar request (closer to his hire) as early as 8/29/24 wherein Plaintiff had written to Nichols via email stating: "Separate from the organization's needs, I made a request in January of 2023 from the Perspective of managing my function from a need for executive functioning as it relates to my ADHD . . . This isn't a request that should be pending since

---

[1] The employee who was the recipient of these comments ultimately resigned, and commented in her exit interview that she did not feel Defendants were supportive of FMLA leave.

January of 2023 . . . Even if the company is still evaluating a CRM or project management tool, I am just asking that I be allowed to purchase the smaller license for my team in the interim."

47. Plaintiff sought updates for over a year prior to Holstein's hire about Monday.com, and she received ongoing excuses that varied over time.

48. Plaintiff, however, did not have the ability to authorize a new application to be implemented within Defendants' computer system; and honestly, if it were just a budgetary question - - Plaintiff would have offered to contribute financially since the cost was so limited.

49. But instead, Plaintiff was given vague answers about Defendants' need to look further into the matter(s).

50. From on or about November 11, 2024 through on or about November 22, 2024 ("the November medical leave"), Plaintiff took a short medical leave of absence.

51. A medical leave of absence of this sort is a reasonable accommodation under the ADA and the NJLAD.[2]

52. Separately, while Plaintiff pursued this leave as a reasonable medical accommodation, Plaintiff's leave was also FMLA-qualifying.

53. Thus, Plaintiff submitted FMLA certification paperwork, which outlined *inter alia* (a) Plaintiff suffered from an "ongoing chronic medical condition;" (b) Plaintiff's health problems have "increased in symptom severity;" (c) she was undergoing "mental health counseling;" and (d) she would resume working by November 25, 2024.

---

[2] The NJ LAD and ADA are interpreted identically with respect to accommodations. *See e.g. Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F.Supp.2d 694 (E.D. PA 2010)(time off from work, even up to 3 months can constitute a reasonable accommodation); *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135 (3d Cir. 2004)(federal courts have permitted leave to be a reasonable accommodation under anti-discrimination laws); *Shannon v. City of Philadelphia*, WL 1065210 (E.D. Pa. 1999)(time off from work for an extended period of time is a reasonable accommodation under the ADA). Defendants not only violated the FMLA but terminated Plaintiff for utilizing and seeking reasonable accommodations of time off from work.

54. On or about November 26, 2024 (the day after Plaintiff returned from FMLA leave), Plaintiff requested a meeting with CEO Holstein to discuss return to work needs and various behaviors by CEO Holstein that she felt were inappropriate.

55. During this meeting, CEO Holstein was very direct with Plaintiff about his intolerance of her need for leave accommodations – stating that if her mental health was affecting her, she should simply "step away from the company," or look for another job as "things aren't slowing down any time soon."

56. Plaintiff couldn't believe Holstein would even make derogatory comments about her latest FMLA absence, as Plaintiff assisted with work matters during the time she was out (as there were pressing benefits issues arising and team members were reaching out to her, which was well known to Holstein).

57. During this meeting, Plaintiff emphasized to Holstein in response -- that taking FMLA (for mental health or otherwise) was her "legal right."

58. Plaintiff also raised concerns of selective mistreatment between Plaintiff and a (white) executive peer, who was exercising FMLA for a family member, whom CEO Holstein was treating better than Plaintiff, and how this selective treatment was negatively affecting Plaintiff.

59. Post hire of CEO Holstein, Plaintiff became more adamant about getting a conclusive answer regarding her medical accommodation of utilizing Monday.com.

60. Plaintiff tried to impress upon CEO Holstein that as a member of leadership and someone in Human Resources, what was transpiring at this point was "discriminatory" and illegal as a non-accommodation.

61. Plaintiff was obviously hopeful that this (relatively new) CEO would take the matter seriously and resolve Plaintiff's concerns in a prompt fashion.

62. Instead, Plaintiff experienced more of the same delays (as she had prior).

63. On the same date as their November 26, 2024 meeting (discussed *supra*), CEO Holstein asked Plaintiff (via email) to "summarize" why Monday.com was appropriate (per her many medical accommodation requests) as opposed to "Microsoft Planner and Project" (another application).

64. Plaintiff then provided a comprehensive outline to CEO Holstein via email dated December 18, 2024 of why Monday.com was necessary from a medical standpoint (outlining what other software or applications could not similarly accomplish).

65. Moreover, as of December 18, 2024, Plaintiff's medical accommodation request for Monday.com was also supported by a medical (mental health) professional who was a direct employee of Defendants; despite Defendants' own medical provider supporting Plaintiff's needed accommodation, she was still not accommodated.

66. Separately, as already alluded to, Plaintiff was still dealing with internal issues related to Defendants' compliance with local and state laws related to pay practices, leave tracking, record keeping requirements, OSHA adherence, IRCA/1-9 compliance (as mere examples).

67. In the late Fall of 2024, Defendants refused to lawfully pay an employee earned wages (this was not a "gray area" but a very clear cut issue – referred to as the most recent "pay dispute"); yet, Plaintiff was lectured by CEO Holstein about giving her legal opinion, and told when he wanted an "HR opinion" he would come to her – but if he wanted a "legal opinion," he would go to legal.

68. Plaintiff was completely dumbfounded, as the person overseeing all Human Resources functions affecting over 500 employees, her job was to ensure that Defendants' managers and personnel were compliant with employment laws and adhering to laws affecting pay obligations under state and federal law.

69. After this dispute about refusing to lawfully pay an employee earned wages, Plaintiff was enduring significant hostility from management (which she perceived was also related to her ongoing health issues, or those of her daughter).

70. Defendants' refusal to accept Plaintiff's input on HR issues compounded itself when CEO Holstein was singling out a black Human Resources employee, who was also on protected FMLA leave for a child on FMLA.

71. CEO Holstein began penalizing this employee by taking away job duties this woman was directly assigned and working on, and diverting them to anther HR person who was non-black and who was not exercising FMLA rights.

72. On January 15, 2025, Plaintiff directly opposed CEO Holstein's mistreatment of this protected employee, and explained that his conduct (and similar conduct within Defendants) was "setting the company up for discrimination charges."

73. Plaintiff was then admonished that a teams chat was not the proper forum for her complaint, and he suggested she call him on the phone.

74. By February of 2025, Plaintiff's daughter was diagnosed with autism, and Plaintiff informed CEO Holstein of her daughter's diagnosis, after having attended an appointment with her daughter during working hours for this appointment.

75. Instead, from late 2024 and through February of 2025, Plaintiff was experiencing significant antagonism such as: (a) hostility in tone from leadership; (b) isolation; (c) non-inclusion in various matters relevant to Plaintiff's role; and (d) other forms of mistreatment.

76. Effective on or about March 6, 2025, Plaintiff was abruptly terminated.

77. Prior to her termination, Plaintiff was not issued any type of discipline, nor any type of performance improvement plan or the like.

78. In fact, Plaintiff was paid above the 3% allotted for annual increases, for her positive contributions and work performance.

79. Plaintiff was informed the termination had to do with her "performance" (a complete pretext). The sole issues raised were project leadership/time management; however, Plaintiff was more than competently performing her job duties, and *was long asking for a medical accommodation that would directly impact project leadership/time management*.[3]

80. At the time of Plaintiff's termination, Defendants presented her with an unsolicited severance agreement, seeking a waiver of all potential claims – including those under

---

[3] A District Court in our Circuit addressed a similar concern:

> "[W]e note that the possibility that Plaintiff's performance issues correlated with her symptoms of her depression (e.g., difficulty concentrating, thinking, and sleeping) plays into our consideration of whether Defendant's proffered reason was pretext. *See Kurten v. Hanger Prosthetic and Orthotics, Inc.*, 402 F. Supp. 2d 572, 588 (W.D. Pa. 2005) (denying summary judgment on ADA discrimination claim, stating that the court "cannot analytically consider the Defendant's proffered legitimate reason for terminating the Plaintiff apart from the Plaintiff's alleged cognitive disability which may have caused the Plaintiff's poor performance"). Plaintiff complained about difficulties with concentrating, sometimes while she was at work, and stated that she often became distracted and scattered. Plaintiff also had difficulties processing new information, and remembering things. It is reasonable to infer that these symptoms may have, in part, been the reason that Plaintiff failed to turn in lesson plans and IEP progress reports on time, or failed to complete lesson plans to the specifications of her new supervisors. The complexity of cognitive disabilities, such as Plaintiff's depression, when analyzed in the context of deficient performance as the proffered reason for an adverse employment action, requires a delicate factual assessment that is more appropriate for a jury to undertake than the Court."

*Aptaker v. Bucks Cty. Intermediate Unit No. 22*, No. 14-2255, 2015 U.S. Dist. LEXIS 118212, at *42-43 (E.D. Pa. Sep. 3, 2015); *and see Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001)(triable issue of fact where Plaintiff's disability was anxiety and a work from home accommodation (denied) would have enabled her to perform essential functions of transcriptionist given condition).

the "Family and Medical Leave Act," and the "New Jersey Law Against Discrimination." This type of severance can be considered by a court as evidence of retaliation.[4]

81. During Plaintiff's termination meeting, Plaintiff openly protested that the termination was in violation of the ADA.

## Count I
## Violations of Family and Medical Leave Act ("FMLA")
### (Interference & Retaliation)
### - Against All Defendants -

82. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

83. Plaintiff was a full-time employee who worked for Defendants for more than 1 year within a location that employed at least 50 employees within 75 miles.

84. Plaintiff put Defendants on notice of the need for FMLA-qualifying leave for both herself and her daughter.

85. Plaintiff seeks relief herein for: (a) Defendants' attempts and actions to dissuade use of FMLA rights and privileges; (b) for terminating Plaintiff in close temporal proximity to

---

[4] It is well established nationally that when severance or release agreements are presented to individuals contemporaneous to termination where payments are not legally required - - this constitutes evidence of discrimination, retaliation or pretext. *See e.g. Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at the time of termination when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc*., 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

her exercise of her FMLA rights; (c) for terminating Plaintiff as a direct result of her complaints that Defendants were mistreating herself other employees who availed themselves of FMLA leave.

## Count II
### Violations of New Jersey Family Leave Act ("NJ-FLA")
(Interference & Retaliation)
- Against All Defendants –

86. Plaintiff was terminated in violation of the NJ FLA, as Plaintiff had placed Defendants on notice that her daughter was suffering from serious health conditions, which required Plaintiff to take time off to care for her daughter, including in the months leading to her termination.

87. However, Plaintiff was met with overt antagonism and efforts to dissuade Plaintiff from taking leave to care for her daughter.

88. The NJ FLA explicitly permits employees to take leave beyond what the FMLA permits for one's own serious health condition; thus regardless of any FMLA Plaintiff had taken for herself, she was still entitled to an additional 12 weeks of job protected leave under the NJ FLA. *See* NJ FLA, at § 13:14-1.6

89. The NJ FLA violation outlined herein permits actual damages, past and future lost wages, emotional distress damages, punitive damages, attorney's fees and costs (as do other applicable laws).

## Count III
### Violation of the New Jersey Law Against Discrimination (NJ LAD)
([1]Actual/Perceived/Record of Disability Discrimination;
[2] Failure to Accommodate and [3] Retaliation)

90. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

91. Plaintiff was subjected to the following actions for which she seeks relief: (a) failure to be reasonably accommodated due to Defendants' failure to ever address (approve or deny) the Monday.com software request; retaliation for continuing pursuing these accommodations (as well as taking leave for these same disabilities); (b) discriminatory termination as a direct result of her serious health disclosures related to her mental health disabilities; and (c) retaliation for seeking reasonable medical accommodations and protesting in good faith what she believed was illegal discrimination.

92. Plaintiff also pursues a claim for retaliation for raising concerns of race discrimination.

93. These actions as aforesaid are violations of the NJ LAD.

### Count IV
### Violations of the Americans with Disabilities Act, as amended ("ADA")
([1]Actual/Perceived/Record of Disability Discrimination;
[2] Failure to Accommodate and [3] Retaliation)

94. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

95. Plaintiff suffered from qualifying health conditions under the ADA (as amended), which (at times) affected her ability to perform daily life activities.

96. Plaintiff requested reasonable accommodations from Defendant as outlined in this lawsuit.

97. Plaintiff was terminated by Defendants:

   (a) For requesting accommodations (constituting unlawful retaliation);

   (b) For protesting in good faith what she believed was illegal discrimination;

   (c) Because of her perceived, actual or record disabilities.

98. Defendant's termination of Plaintiff for these reasons constitutes unlawful retaliation and discrimination in violation of the ADA.

### Count V
### Violation of 42 U.S.C. Section 1981
### (Retaliation)

99. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

100. In January of 2025, Plaintiff raised concerns of race discrimination, and was met with immediately hostility (for placing those concerns in writing), and thereafter subject to significant antagonism and terminated by March of 2025.

101. Thus, Plaintiff pursues claims for retaliation under Section 1981.

**WHEREFORE**, Plaintiff prays that this Court enter an order providing that:

A. Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom(s) of discriminating against employees based on their gender, disabilities or complaints of discrimination, and are to be ordered to promulgate an effective policy against such discrimination/retaliation/interference and to adhere thereto;

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, reinstate Plaintiff where determined to be possible and/or feasible, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay (absent reinstatement), salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered the aforesaid unlawful actions at the hands of Defendants until the date of verdict;

  C. Plaintiff is to be awarded punitive or liquidated damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct, and to deter Defendants or other employers from engaging in such misconduct in the future;

  D. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress and pain and suffering);

  E. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

  F. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

  G. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

        Respectfully submitted,

        **KARPF, KARPF, & CERUTTI, P.C.**

    By: _/s/ Ari R. Karpf_
      Ari R. Karpf
      8 Interplex Drive, Suite 210
      Feasterville-Trevose, PA 19053
      (215) 639-0801
      akarpf@karpf-law.com

Dated: July 3, 2025